SALCINES, Judge.
Warren Williamson appeals his conviction for lewd and lascivious act on a person under sixteen years of age in contravention of section 800.04(4), Florida Statutes (1991). We reverse.
Williamson was originally charged by information in 2000 and was tried on a second amended information filed in 2001. The information alleged that Williamson *922 directed M.S. to touch or fondle him in a lewd or lascivious manner. The single incident which gave rise to the charges against Williamson occurred between July 15, 1992, and December 31, 1992. The matter proceeded to a bench trial in 2001.
By the time of the trial, M.S. was seventeen years of age. However, at the time of the incident, in 1992, she was eight years old. Williamson was the live-in boyfriend of M.S.’s mother for seven years beginning in July 1992. The three resided in a two-bedroom, two-level apartment townhouse.
When M.S. was eight years old, Williamson sometimes babysat her while her mother was at work. M.S. testified that, on one of the days when Williamson was babysitting her, she came down the stairs of the townhouse with a three-foot tall plastic container which was partially filled with coins. Williamson, who was wearing swim trunks, had his back turned to her. M.S. snuck up behind Williamson and dumped the coins into his swim trunks. Some of the coins fell out of the leg openings of Williamson’s swim trunks and scattered about the floor. The rest of the coins became lodged in Williamson’s swim trunks causing it to look as if he had “poop” in his pants. M.S. then began to pat the area where the coins were hanging down in the swim trunks, causing more coins to fall out. Williamson and M.S. both thought the prank was funny and both laughed about it.
At some point, Williamson got down on the floor to pick up all the scattered coins. M.S. put more coins down Williamson’s swim trunks, got down on her knees behind Williamson, and patted the area of the swim trunks where the coins had lodged. M.S. put coins in Williamson’s swim trunks and “patted them out” a total of three times.
M.S. testified that Williamson told her “there were more coins there,” and she put coins in Williamson’s swim trunks after he said that. However, the record provides no guidance as to when, during the progression of the incident, Williamson said that or what was meant by his statement. Also, according to M.S., at some point Williamson put coins in his swim trunks. She testified:
Q. Did he at any point ever take the coins, himself, and put them in or not?
A. Yes, I remember that.
Q. Tell me how that happened.
A. I remember — I remember him standing up and I remember seeing his shoulders, and I remember—
Q. Was he facing you then or facing somewhere else?
A. Yeah, he was touching himself like right here (indicating), and he reached down.
Q. Let me stop you for a few seconds on this one. Where was he touching himself on his body? What was he touching?
A. I’m not sure because he had his back to me. I remember I seen him reaching down. I remember his hands. I saw his elbows from like the back of him, like this (indicating).
Q. Did you eventually see him from the front?
A. No. He went back on all fours and he was — I remember being by the back of him and I remember seeing his head upside down, and I was — I was behind his butt patting him out, and then I remember being on the other side of him patting him out.
Again, the record provides little guidance as to when that occurred within the sequence of the activity. Williamson testified that he was standing when the incident began, but that he got down on the floor afterward to pick up the coins.
Both M.S. and Williamson laughed during the ruckus. Indeed, Williamson testi *923 fied that M.S. was squealing hysterically. Both M.S. and Williamson testified that, at the time, they perceived the incident to be funny, a prank or a joke. Williamson testified that as soon as the joking around began to make him feel uncomfortable, he told M.S. it was weird and told her to stop. M.S. testified that the encounter simply ended but that she had no recollection of how it ended, and that the entire activity lasted more than five minutes but less than ten minutes.
M.S. testified that Williamson did not touch her during the encounter. Likewise, M.S. testified that at no time did she view Williamson’s genitals or touch his genitals inside his swim trunks. Williamson maintained that the activity was entirely innocent.
As part of the criminal investigation in the case, a controlled telephone call was arranged between M.S. and Williamson. During the recorded conversation, which was introduced at the trial, M.S. and Williamson discussed the incident. Williamson appeared to be upset during the conversation and made references to the fact that he used to “drink too much.” During the call, when M.S. asked if that was his explanation, he was just drunk, Williamson stated:
I don’t even remember what went on except I remember we were — I think I put some — I put some ice down your pants, PJs, and you ran around and grabbed a handful of pennies, put them down my shorts. And I’m going to tell you something. I never should have been, you know, wearing underwear. And I remember pennies flying everywhere. We were just laughing like it was so funny. And then I remember feeling, ooh, you know, this is weird. This is weird, it’s not right. (Unintelligible) God, if I — I would never hurt you.
On appeal, Williamson asserts that the facts do not support his conviction because there was no proof of intent and no proof that he instigated the event. The State contends that although Williamson did not initiate the event, his active participation in its continuation provided the requisite intent necessary to establish a violation of law.
There is no all-encompassing list of acts which would constitute a lewd or lascivious act under section 800.04. See Egal v. State, 469 So.2d 196 (Fla. 2d DCA 1985). In Egal, this court opined that the legislature has failed to provide a definition of lewd and lascivious, that it would be difficult or impossible to list all acts which might be connoted lewd and lascivious, and that the courts must determine, on a case-by-case basis, whether an act falls within the purview of the statute. Id. at 197. This court explained that the term “lewd and lascivious” has been said to connote “wicked, lustful, unchaste, licentious, or sensual design on the part of the perpetrator.” Egal, 469 So.2d at 198. In Egal, we recognized that “conduct which in some circumstances might be purely innocent, such as nudity, can be found to be lewd and lascivious if accompanied by the requisite improper intent.” Id. In Egal, this court determined that a jury could find the requisite intent from the circumstances therein.
In the present case, there was no evidence from which the trial court could infer Williamson’s “wicked, lustful, unchaste, licentious, or sensual design.” Williamson did not initiate the event. The encounter was brief and, at the moment he felt uncomfortable with the situation, Williamson immediately directed M.S. to stop. Thus, the evidence indicates that Williamson did not allow the encounter to continue beyond propriety. The conversation which transpired during the controlled call did not provide a basis upon which to infer intent. Because there was no evidence *924 from which the requisite intent could be inferred, Williamson’s conviction cannot be sustained.
Reversed.
CASANUEVA, J., and THREADGILL, EDWARD F., Senior Judge, concur.